UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BETTY J. SUMMERLAND, | ) | |
| | ) | |
| Plaintiff, | ) | 19 C 1333 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| EXELON GENERATION COMPANY, BARBARA | ) | |
| POHLMAN, and TRIANGLE OCCUPATIONAL | ) | |
| MEDICINE, P.A., | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Betty Summerland sued her employer, Exelon Generation Company, and two of its

contractors—Triangle Occupational Medicine and Betty Pohlman, Triangle's principal officer

and owner—alleging violations of the First and Fifth Amendments, the Family and Medical

Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*., Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e *et seq*., the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*.,

and 42 U.S.C. § 1985(3).  Doc. 19.  Defendants move under Civil Rule 12(b)(6) to dismiss the

operative complaint.  Docs. 43, 46.  The motion is granted in part and denied in part.

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative

complaint's well-pleaded factual allegations, though not its legal conclusions.  *See Zahn v. N.*

*Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016).  The court must also consider

"documents attached to the complaint, documents that are critical to the complaint and referred

to in it, and information that is subject to proper judicial notice," along with additional facts set

forth in Summerland's brief opposing dismissal, so long as those additional facts "are consistent

with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Summerland as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

### A. Exelon and Summerland

Exelon, an energy company, has nuclear power production facilities in Braceville and LaSalle, Illinois. Doc. 19 at ¶¶ 4, 7. Summerland began work at the LaSalle facility in August 2011 and was promoted to the Braceville facility in 2013. *Id.* at ¶ 7. She is currently employed at Braceville as an Office Service Specialist. *Ibid*.

Summerland suffers from several mental/emotional health conditions, including adjustment, anxiety, and depression disorders. *Id.* at ¶ 8. Those conditions sometimes prevent her from working, driving, or otherwise leaving her home, and they occasionally manifest in panic attacks that render her dysfunctional. *Ibid*. After Exelon placed her on medical leave in June 2017, Summerland began treatment with a professionally licensed health care provider. *Id.* at ¶¶ 9, 11-12.

Summerland returned to work in August 2017. *Id.* at ¶ 11. She responsibly manages her treatment and, as a result, has maintained a discipline-free work record. *Id.* at ¶ 10. Her work performance evaluations are positive, marred only by non-substantive criticism from supervisors who are hostile to her disability. *Ibid*.

### B. Summerland's Work Schedule

For five years, Summerland's shift was from 6:00 a.m. to 2:30 p.m., which allowed her to attend the last time slot offered by her therapist in Morris, Illinois. *Id.* at ¶ 13. On November 16, 2017, Exelon moved Summerland's shift to 7:00 a.m. to 3:30 p.m. *Id.* at ¶ 14. Because it took

Summerland forty minutes to leave her work desk and drive to her therapy sessions, the schedule change prevented her from "timely driving to and attending her [therapist's] last therapy time-slot" at 4:00 p.m. *Id*. at ¶ 14; Doc. 60 at ¶ 4. The therapist sometimes allowed Summerland to begin at 4:30 p.m. Doc. 19 at ¶ 14. Doing so, however, was contrary to the therapist's operating procedures, and the therapist was unlikely to make this accommodation in the future. *Ibid*.

After her work schedule was changed, Summerland tried to negotiate with Exelon for a schedule that would allow her to attend therapy at 4:00 p.m., but Exelon refused. *Id*. at ¶ 15. The refusal triggered a panic attack, which prevented Summerland from working and required her to take a vacation day to seek therapy. *Ibid*.

In September 2019, Exelon changed Summerland's shift back to the original 6:00 a.m. to 2:30 p.m. schedule. Doc. 60 at ¶ 8. Summerland now can attend 4:00 p.m. sessions with her therapist. *Ibid*.

### C. Summerland's Use of FMLA Leave and the Last Chance Agreement

On November 16, 2017, Summerland submitted a request for FMLA medical leave. Doc. 19 at ¶ 16. Exelon approved the request four days later. *Id*. at ¶ 17. On November 30, Summerland "called-in" another FMLA leave request. *Id*. at ¶ 18. When she did so, Pohlman—whom the complaint appears to allege was Exelon's site nurse—told her that her "'badge was being pulled'" and that she would be referred to Exelon's Employee Assistance Program ("EAP"). *Id*. at ¶¶ 18-19.

On December 19 and 20, 2017, while she was on FMLA leave, Exelon's Medical Review Officer ("MRO"), an EAP staffer, and Pohlman informed Summerland that she was on "'a last chance agreement.'" *Id*. at ¶ 19. Specifically, Pohlman and the EAP staffer told Summerland that if she again requested FMLA or sick leave due to her mental health conditions, Exelon would permanently revoke her work site access; the MRO added that she was untrustworthy and

warned that she "'did not work at Walmart.'"  *Ibid*.  Exelon did not comply with Summerland's several requests for a copy of the last chance agreement.  *Id*. at ¶ 25.

Summerland could not access or work at the Exelon worksite from the time her badge was pulled on November 30, 2017 until it was returned on January 2, 2018 upon her therapist's determination that she was "fit for duty."  *Id*. at ¶ 18.  Permanently pulling an employee's badge is tantamount to termination.  *Id*. at ¶ 20.  Due to the restrictions imposed by the last chance agreement, Summerland has attempted to obtain therapy without requesting FMLA leave, which aggravated her mental health conditions and prevented her from obtaining therapy when she needed it.  *Id*. at ¶ 23.

### D.    Subsequent Events

On May 15, 2018, some four months after Summerland returned to work, Exelon threatened her with revocation of her work site access because she did not attend a scheduled therapy session.  *Id*. at ¶ 21.  Summerland had rescheduled the session due to a conflicting medical appointment for her leg.  *Ibid*.

On August 17, 2018, an Exelon maintenance supervisor, who was aware of Summerland's last chance agreement, told her that Exelon knew that she had been the only witness to alleged Title VII violations in the maintenance department.  *Id*. at ¶ 24.  The supervisor told Summerland that he or she would "'hate to see anything happen to [Summerland].'"  *Ibid*.  Summerland interpreted this comment as a threat.  *Ibid*.

On November 5, 2018, Summerland filed a charge against Exelon with the Equal Employment Opportunity Commission ("EEOC"), claiming that she was "discriminated against because of [her] disability, and in retaliation for engaging in protected activity, in violation of the [ADA]."  Doc. 19-2 at 2.  The EEOC issued a right-to-sue letter weeks later, *id*. at 1, after which Summerland timely filed this suit, Doc. 1.

4

**Discussion**

## I.     Preclusion of Judicial Review

Defendants contend that *Department of the Navy v. Egan*, 484 U.S. 518 (1988), and 10 C.F.R. 26.189(d) preclude the court's consideration of Summerland's claims.  Doc. 48 at 12-17.

### A.     *Department of the Navy v. Egan*

*Egan* concerned an employment-related dispute at the Trident Naval Refit Facility, which maintains and repairs Trident submarines.  484 U.S. at 520.  The Trident is a nuclear-powered and nuclear-armed vessel that plays a "crucial part in our Nation's defense system."  *Ibid*.  Given the nature of the facility's work, employment there required security screening.  *Ibid*.  The Navy rejected Egan's security clearance after learning that he had failed to disclose certain criminal convictions.  *Id*. at 521.  Egan sought review from the Merit Systems Protection Board.  *Id*. at 522-23.  The "narrow question presented" to the Supreme Court was "whether the [Board] ha[d] authority by statute to review the substance of an underlying decision to deny or revoke a security clearance in the course of reviewing an adverse action."  *Id*. at 520.

The Court held that that the Board lacked that authority.  *Id*. at 526-30.  The Court grounded its decision in Article II, reasoning: "[The President's] authority to classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to such information flows primarily from [Article II's] investment of power in the President and exists quite apart from any explicit congressional grant."  *Id*. at 527.  Security clearance determinations, the Court explained, require a "[p]redictive judgment" about "whether, under compulsion of circumstances or for other reasons, [an individual] might compromise sensitive information."  *Id*. at 528-29.  Consequently, the Court held, an "outside nonexpert

body" like the Board lacked the authority to "review the substance" of an Executive Branch security clearance decision. *Id*. at 529.

Invoking *Egan*, Defendants argue that "to the extent [Summerland] contends [Exelon] retaliated against her by 'pulling her badge,' denying her unescorted access privileges, or issuing her a 'last chance agreement' regarding her mental health conditions, each of those actions are matters of national security, entrusted to the Executive Branch, and over which this Court does not have jurisdiction." Doc. 43 at 2. Defendants observe that Summerland works not at "just any jobsite," but at "a nuclear power plant operated pursuant to a license issued by" the Nuclear Regulatory Commission ("NRC"). Doc. 48 at 12; *see* 10 C.F.R. § 50.57 (detailing the qualifications for licensure). NRC regulations govern who may be granted access to nuclear power facilities. *E.g.*, 10 C.F.R. § 73.56. According to Defendants, it follows that the court lacks the authority to review the merits of Summerland's claims, which necessarily entail a challenge to their assessment of her mental fitness to have access to and to work at Braceville.

Two premises underlying Defendants' argument are correct. First, *Egan* applies to court as well as agency review of the merits of a security clearance determination. *See Whitney v. Carter*, 628 F. App'x 446, 447 (7th Cir. 2016); *accord*, *e.g.*, *Campbell v. McCarthy*, 952 F.3d 193, 202-03 (4th Cir. 2020); *Hale v. Johnson*, 845 F.3d 224, 229 (6th Cir. 2016); *Kaplan v. Conyers*, 733 F.3d 1148, 1156 (Fed. Cir. 2013) (en banc); *Toy v. Holder*, 714 F.3d 881, 884 (5th Cir. 2013); *El-Ganayni v. Dep't of Energy*, 591 F.3d 176, 183 (3d Cir. 2010); *Hall v. Dep't of Labor*, 476 F.3d 847, 852 (10th Cir. 2007); *Bennett v. Chertoff*, 425 F.3d 999, 1001 (D.C. Cir. 2005); *Hill v. White*, 321 F.3d 1334, 1336 (11th Cir. 2003); *Brazil v. U.S. Dep't of the Navy*, 66 F.3d 193, 196 (9th Cir. 1995). Second, employment-related claims alleging adverse actions arising from security clearance determinations necessarily entail review of the merits of those

determinations, and thus are likewise barred by *Egan*. *See Campbell*, 952 F.3d at 203-05 (holding that *Egan* applies to suits brought under Title VII and the Age Discrimination in Employment Act); *Toy*, 714 F.3d at 884 ("[The court] ha[s] applied [*Egan*] in the context of Title VII."); *Hall*, 476 F.3d at 853 ("To review the circumstances under which the Army recommended revocation of [the plaintiff's] security clearance for evidence of retaliation is to review the basis of the determination itself."); *Perez v. FBI*, 71 F.3d 513, 514-15 (5th Cir. 1995) ("Because the court would have to examine the legitimacy and the possibly pretextual nature of the FBI's proffered reasons for revoking the employee's security clearance, any Title VII challenge to the revocation would of necessity require some judicial scrutiny of the merits of the revocation decision.") (footnote omitted); *Brazil*, 66 F.3d at 197 ("The second and third steps of the Title VII analysis present an insurmountable hurdle for [the plaintiff]. It is impossible for the court to establish in the first place whether the Navy's proffered reasons were legitimate without evaluating their merits.").

Defendants' invocation of *Egan* falters, however, because the pleadings do not say anything about a government-issued security clearance, let alone establish that Summerland's position at or access to the Braceville facility required a security clearance. Consequently, on the facts alleged, *Egan* does not preclude the court's ability to review the merits of her claims. *See Hale*, 845 F.3d at 231 (holding that *Egan* did not apply where "physical fitness" requirements, not security clearance determinations, were at issue); *Toy*, 714 F.3d at 885-886 (same, where only FBI building access was at issue); *cf. Rattigan v. Holder*, 689 F.3d 764, 768 (D.C. Cir. 2012) (declining to apply *Egan*, even though security clearance-related decisions were at issue, because the decisions were made by untrained and unspecialized "FBI employees who merely report security concerns").

The complaint does allege that Summerland required badge access to enter the Braceville facility. Doc. 19 at ¶¶ 18, 20. Seizing on that point, Defendants maintain that the denial of unescorted access to a facility is merely one type of security clearance denial, and therefore that claims concerning the denial of unescorted access are precluded by *Egan*. Doc. 48 at 15 ("[A] court has no jurisdiction to review decisions regarding security clearances, including unescorted access, or the circumstances upon which security clearances are granted or denied."). Defendants are incorrect because, as the Fifth Circuit correctly explained, "[s]ecurity clearances are different from building access." *Toy*, 714 F.3d at 885. The review, grant, and revocation of security clearances are subject to procedures, imposed by Executive Order, that address who may access *classified information*—not who may enter and access *buildings*. *See* Exec. Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009) (requiring the agency head or designee to make a "determination of eligibility for access" to classified information); Exec. Order No. 12,968, 60 Fed. Reg. 40245 § 5.2 (Aug. 2, 1995) (outlining the process for reviewing the denial or revocation of a security clearance). The review, grant, and revocation of unescorted building access to nuclear power plants, by contrast, are governed by a wholly distinct set of regulations. *See*, *e.g.*, 10 C.F.R. §§ 26.3, 26.4, 26.23, 26.27, 26.77, 26.189, 73.56. Given the significant distinctions in the legal regimes governing security clearances and building access, Defendants fail to show that unescorted access to a nuclear power plant is the practical or legal equivalent to a security clearance for *Egan* purposes. *See Toy*, 714 F.3d at 885-86.

Defendants next argue that *Egan* preclusion governs claims that necessarily entail review of employment decisions regarding "sensitive positions." Doc. 48 at 15-17. Based on its observation that "[o]ccupying a 'sensitive' position is parallel to holding a security clearance," the Seventh Circuit in *Whitney* held that *Egan* extends to cases entailing review of decisions

involving sensitive positions. 628 F. App'x at 447 (citing *Kaplan*, 733 F.3d at 1159, 1166). But the plaintiff in *Whitney* "d[id] not deny that the position he s[ought] [was] sensitive." *Ibid*. Here, by contrast, the pleadings do not say whether Summerland's position is sensitive or nonsensitive. *See generally Egan*, 484 U.S. at 528 ("[T]he [federal] [g]overnment classif[ies] jobs in three categories: critical sensitive, noncritical sensitive, and nonsensitive."). Accordingly, it would be inappropriate at this stage, on the present record, to bar Summerland's claims on this ground.

> **B.       10 C.F.R. § 26.189(d)**

Federal regulations governing access to nuclear power facilities require licensed entities like Exelon to maintain certain requirements for employees granted "unescorted access." *E.g.*, 10 C.F.R. § 73.56 (detailing "access authorization requirements" for nuclear facilities). Pertinent here, Exelon must implement a Fitness for Duty ("FFD") program to ensure that employees are physically and mentally capable of safely performing their jobs. *See* 10 C.F.R. §§ 26.3(a), (b), 26.4. If there are "indications that an individual … may be in violation of the licensee's or other entity's FFD policy or is otherwise unable to safely and competently perform his or her duties," a "determination of fitness must be made by a licensed or certified professional who is appropriately qualified and has the necessary clinical expertise." 10 C.F.R. § 26.189(a). Once that fitness review is conducted, "[n]either the individual nor licensees and *other entities* may seek a second determination of fitness if a determination of fitness … has already been performed by a qualified professional employed by or under contract to the licensee or other entity." 10 C.F.R. § 26.189(d) (emphasis added).

Defendants contend that because the court is an "other entity" within the meaning of § 26.189(d), and because resolving Summerland's claims would require the court to review the merits of Defendants' assessment of her fitness—or, as the regulation puts it, perform "a second

determination of fitness"—the regulation precludes those claims. Doc. 48 at 12-14. Even assuming that a regulation could preclude the court's consideration of a statutory employment discrimination claim, Defendants' contention fails because its central interpretive premise—that the court is an "other entity" within the meaning of § 26.189(d)—is incorrect.

As is plain from how § 26.189 in all other instances deploys the term, "other entity" unambiguously means licensees that operate nuclear facilities or entities that assist those licensees in some fashion. *See*, *e.g.*, 10 C.F.R. § 26.189(a) ("A determination of fitness is the process entered when there are indications that an individual … may be in violation of the licensee's or other entity's FFD policy … [and] … must be made by a licensed or certified professional who is appropriately qualified … as verified by the licensee or other entity."), § 26.189(b)(2) ("A determination of fitness must be made … [b]efore making return-to-duty recommendations after an individual's authorization has been terminated … under a licensee's or other entity's FFD policy."), § 26.189(b)(4) ("A determination of fitness must be made … [w]hen potentially disqualifying FFD information is otherwise identified and the licensee's or other entity's reviewing official concludes that a determination of fitness is warranted."), § 26.189(c)(2) ("This result does not constitute a violation of … the licensee's or other entity's FFD policy," but "the professional who made the determination of fitness shall consult with the licensee's or other entity's management personnel" and the "[l]icensee or other entity management personnel shall implement the required actions."), § 26.189(d) ("[O]ther entities shall assist in arranging for consultation between the new professional and the professional who is no longer employed by or under contract to the licensee or other entity."). Viewed in context, none of those references to "other entity" could possibly refer to a court. It necessarily follows that the term "other entity" in the portion of § 26.189(d) invoked by Defendants does not include

a court. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (holding that "identical words used in different parts of the same act are intended to have the same meaning") (internal quotation marks omitted); *see also Dewsnup v. Timm*, 502 U.S. 410, 422 (1992) (Scalia, J., dissenting) (explaining that "identical words used in different parts of the same act are intended to have the same meaning," and that this "rule must surely apply … to use of identical words *in the same section of the same enactment*"); *State Farm Mut. Auto. Ins. Co. v. Comm'r of Internal Revenue*, 698 F.3d 357, 371 (7th Cir. 2012) ("[T]he canon that identical terms or phrases in the same statute have the same meaning surely carries a great deal of force when dealing with such a highly technical and defined term in consecutive subparagraphs of the same [agency] regulation."). This in turn means that the regulation's prohibition of "second determination[s] of fitness" does not preclude the court from hearing Summerland's claims. *See Exelon Generation Co. v. Local 15, IBEW, AFL-CIO*, 676 F.3d 566, 573 (7th Cir. 2012) (holding that the term "vendor" in 10 C.F.R. § 73.56(a)(4), which concerns unescorted access authorization programs, does not include labor arbitrators).

## II. Summerland's Claims

### A. FMLA Claims

The FMLA entitles an employee to twelve work weeks of unpaid leave where a serious health condition renders her unable to perform her job. *See* 29 U.S.C. § 2612(a)(1)(D), (b)(1). Summerland brings FMLA interference and retaliation claims against Exelon. Doc. 19 at ¶¶ 31-93. Exelon seeks dismissal of both.

#### 1. FMLA Interference Claim

The FMLA's interference provision makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). To state an FMLA interference claim, a plaintiff must allege facts

sufficient to show that: "(1) [she] was eligible for the FMLA's protections, (2) [her] employer was covered by the FMLA, (3) [she] was entitled to leave under the FMLA, (4) [she] provided sufficient notice of [her] intent to take leave, and (5) [her] employer denied or interfered with FMLA benefits to which [she] was entitled." *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 816 (7th Cir. 2015) (internal quotation marks, alterations, and punctuation omitted). Exelon focuses on the fifth element, arguing that Summerland's claim fails because she does not allege that it denied her FMLA leave. Doc. 48 at 10-11.

The premise of Exelon's argument is that FMLA interference claims are limited to the denial of FMLA leave. That premise is wrong. As the pertinent regulation provides: "Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b). And as the Seventh Circuit has explained: "[T]he ways in which an employer may interfere with FMLA benefits are not limited simply to the denial of leave. Interference also encompasses using the taking of FMLA leave as a negative factor in employment actions and discouraging an employee from using such leave." *Preddie*, 799 F.3d at 818 (internal quotation marks and alterations omitted). The complaint alleges that Exelon (i) pulled Summerland's badge and placed her on a last chance agreement after she twice took FMLA leave and (ii) threatened to permanently revoke her work site access if she requested further FMLA leave. Doc. 19 at ¶¶ 18-19. Those allegations plainly satisfy the fifth element of Summerland's FMLA interference claim, which accordingly may proceed.

## 2.    FMLA Retaliation Claim

The FMLA's retaliation provision "makes it unlawful for an employer to retaliate against an employee who exercises his FMLA rights." *Carter v. Chi. State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015) (citing 29 U.S.C. § 2615(a)(2), (b)). The complaint alleges that Exelon retaliated

against Summerland by "commit[ing] … acts and omissions … because [she] took leaves from work pursuant to the FMLA." Doc. 19 at ¶ 93. Her opposition brief specifies that Exelon threatened to permanently deny her access to the Braceville facility if she again used FMLA or sick leave. Doc. 52 at 16 (citing Doc. 19 at ¶ 19).

The court assesses "a claim of FMLA retaliation in the same manner that [it] would evaluate a claim of retaliation under other employment statutes, such as the ADA or Title VII." *Burnett v. LFW Inc.*, 472 F.3d 471, 481 n.5 (7th Cir. 2006). To state an FMLA retaliation claim, a plaintiff must allege facts sufficient to show that: "(1) [she] engaged in a protected activity; (2) [her] employer took an adverse employment action against [her]; and (3) there is a causal connection between the protected activity and the adverse employment action." *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012). Exelon focuses on the second element, arguing that Summerland does not allege that it took an adverse employment action against her. Doc. 48 at 11-12. To satisfy that element, an employment action must be "one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Silverman v. Bd. of Educ.*, 637 F.3d 729, 740 (7th Cir. 2011) (internal quotation marks omitted). Such actions include those that effect a "change in work hours, compensation, or career prospects." *Robertson v. Wis. Dep't of Health Servs.*, 949 F.3d 371, 382 (7th Cir. 2020) (internal quotation marks omitted).

As noted, the complaint alleges that after Summerland took FMLA leave, Doc. 19 at ¶ 16-18, Exelon pulled her badge, *id.* at ¶ 18; placed her on a last chance agreement, *id.* at ¶ 19; told her that her work site access would be permanently revoked if she requested further FMLA leave, *ibid.*; and barred her from accessing the Braceville facility from November 30, 2017 through January 1, 2018, *id.* at ¶ 18. Those actions qualify as adverse employment actions for

13

purposes of her FMLA retaliation claim because it is plausible that they would dissuade a reasonable employee from invoking the FMLA. *See Lewis v. City of Chicago*, 496 F.3d 645, 655 (7th Cir. 2007) (holding that the plaintiff stated a viable retaliation claim where her employer "singled her out" by assigning her more dangerous work after she engaged in statutorily protected activity, given that "a reasonable employee would be dissuaded from engaging in [that] protected activity") (internal quotation marks omitted); *cf. Stephens v. Erickson*, 569 F.3d 779, 791 (7th Cir. 2009) (holding that the plaintiff failed to state a retaliation claim where his employer "altered his job duties only minimally," reasoning that his "new tasks [were] not dirtier, more arduous, less prestigious, or objectively inferior, nor d[id] they possess any analogous attribute"). It follows that Summerland's FMLA retaliation claim may proceed.

### B.     Title VII Retaliation Claim

Title VII's retaliation provision "prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice or participating in the investigation of one." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (citing 42 U.S.C. § 2000e-3(a)). Summerland alleges that Exelon violated Title VII when it retaliated against her for being "a witness to Title VII violations committed in [Exelon's] Maintenance Department." Doc. 19 at ¶ 125. Defendants seek dismissal of this claim on exhaustion grounds, arguing that "the alleged retaliation in [Summerland's] EEOC charge is based solely on the ADA—not on Title VII." Doc. 48 at 18.

The "scope of the charge" doctrine provides that a Title VII plaintiff ordinarily may not bring in federal court a claim that the plaintiff did not first present to the EEOC. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974); *Miller v. Am. Airlines, Inc.*, 525 F.3d 520, 525 (7th Cir. 2008). This exhaustion rule "serves the dual purpose of affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion,

and of giving the employe[r] some warning of the conduct about which the employee is aggrieved." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (internal citations omitted). Although the factual basis for a claim in federal court must previously have been presented in an EEOC charge, "because most EEOC charges are completed by laypersons rather than by lawyers, a … plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." *Ibid.* Instead, the pertinent question is whether the claims brought in federal court are "like or reasonably related to the allegations of the [EEOC] charge and growing out of such allegations" or, put another way, whether "there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Ibid.* (internal quotation marks omitted).

Summerland's EEOC charge checks the "Retaliation" and "Disability" boxes, but not the "Race," "Color," "Sex," "Religion," "National Origin," "Age," or "Genetic Information" boxes. Doc. 19-2 at 2. The charge's narrative portion reads in pertinent part:

> I began my employment with [Exelon] in or around August 2011. … [Exelon] is aware of my disability. During my employment, I requested a reasonable accommodation and it was not provided. Subsequently, I was subjected to harassment and placed on a Last Chance Agreement.
>
> I believe I have been discriminated against because of my disability, and in retaliation for engaging in protected activity, in violation of the Americans with Disabilities Act of 1990, as amended.

*Ibid.* The charge says nothing about discrimination based on race, color, sex, religion, or national origin; says nothing about Summerland being a witness to any investigation, let alone an investigation into those types of discrimination; and says nothing that could remotely implicate Title VII. Although the charge alleges *ADA* retaliation based on Summerland requesting a reasonable accommodation, it does not even hint at *Title VII* retaliation claim. The Title VII

retaliation claim is therefore dismissed for failure to exhaust. *See Johnson v. Beach Park Sch. Dist.*, 638 F. App'x 501, 502 (7th Cir. 2016) ("Johnson failed to exhaust her administrative remedies for her age discrimination claim [because] [n]othing in her EEOC charges … even hints at age discrimination."); *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 527 (7th Cir. 2003) (holding that an EEOC charge alleging that the plaintiff was terminated due to her national origin did not exhaust an age discrimination claim where she did not "mention age anywhere in the charge," check the "age-discrimination box," or allege "any other facts that might have alerted the EEOC to the claim").

The dismissal is without prejudice. The Seventh Circuit has explained that "the proper remedy for a failure to exhaust administrative remedies is to dismiss the suit without prejudice, thereby leaving the plaintiff free to refile [her] suit when and if [she] exhausts all of [her] administrative remedies or drops the unexhausted claims." *Greene v. Meese*, 875 F.2d 639, 643 (7th Cir. 1989); *see also Ford v. Johnson*, 362 F.3d 395, 401 (7th Cir. 2004). This principle applies to dismissals for failure to exhaust a claim in an EEOC charge; such dismissals are without prejudice to the plaintiff pursuing her claim in federal court upon properly exhausting the unexhausted claims, subject of course to the statute of limitations and any other defenses. *See Teal v. Potter*, 559 F.3d 687, 693 (7th Cir. 2009) ("Because [the plaintiff] failed to exhaust administrative remedies, her complaint must be dismissed without prejudice."). That said, "[t]he determination that [Summerland] ha[s] failed to exhaust [her] administrative remedies" for her Title VII retaliation claim is "preclusive with respect to an attempt by [her] to relitigate the question whether [she] ha[s] exhausted [her] administrative remedies before filing [this] … suit." *Hill v. Potter*, 352 F.3d 1142, 1147 (7th Cir. 2003).

### C.      ADA Claims

Summerland brings three ADA claims against Exelon: a reasonable accommodation claim; a retaliation claim; and an interference, coercion, or intimidation claim.  Doc. 19 at ¶¶ 126-191.

#### 1.      ADA Reasonable Accommodation Claim

The ADA's discrimination provision states that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability," including by failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee."  42 U.S.C. § 12112(a)-(b).  To state a failure to accommodate claim, a plaintiff must allege facts sufficient to show that: "(1) [she] was a qualified individual with a disability; (2) [the] defendant was aware of [her] disability; and (3) [the] defendant failed to accommodate [her] disability reasonably."  *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019).

Focusing on the third element, Exelon contends that the complaint fails to allege that it did not reasonably accommodate Summerland's disability.  Doc. 48 at 20-21.  "A 'reasonable accommodation' is one that allows the disabled employee to 'perform the essential functions of the employment position.'"  *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017) (quoting 42 U.S.C. § 12111(8)).  Summerland alleges that Exelon failed to make reasonable accommodations for her mental health disability when it refused (from November 2017 through September 2019) to change her schedule back to her original 6:00 a.m. to 2:30 p.m. shift to enable her to see her therapist.  Doc. 19 at ¶¶ 14-15, 126, 157; Doc. 60 at ¶¶ 4, 8.

"[A] 'reasonable accommodation' may include … 'part-time or modified work schedules.'"  *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 288 (7th Cir. 2015) (quoting 42 U.S.C. § 12111(9)(B)).  But Summerland does not allege that her work schedule precluded her

from seeing her therapist. To the contrary, she admits that her therapist "sometimes allowed [her] therapy to begin at 4:30 p.m.," and while she alleges that beginning at 4:30 p.m. was "contrary to the [therapist's] operating procedures and … *unlikely* to be allowed in the future," she does not claim that 4:30 p.m. appointments in fact were not allowed. Doc. 19 at ¶ 14 (emphasis added). And more to the point, having alleged that she performed her job with "a discipline-free work record and satisfactory work-performance evaluations" from November 2017 through September 2019, *id*. at ¶ 10, Summerland necessarily admits that she was able to perform the essential functions of her job without her requested accommodation. It follows that her accommodation claim fails as a matter of law. *See Brumfield v. City of Chicago*, 735 F.3d 619, 632 (7th Cir. 2013) ("[A]n employer need not accommodate a disability that is irrelevant to an employee's ability to perform the essential functions of her job—not because such an accommodation might be unreasonable, but because the employee is fully qualified for the job without accommodation and therefore is not entitled to an accommodation in the first place."); *see also Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 852 (7th Cir. 2015) (similar).

### 2. ADA Retaliation Claim

The ADA's retaliation provision states: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual … participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). To state an ADA retaliation claim, a plaintiff must allege facts sufficient to show that: "(1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two." *Guzman v. Brown Cnty.*, 884 F.3d 633, 642 (7th Cir. 2018). The complaint alleges that Exelon retaliated against Summerland by "commit[ing] … acts and omissions" against her because she requested a reasonable accommodation for her disability. Doc. 19 at ¶ 159. As with

18

her parallel FMLA retaliation claim, Summerland's opposition brief specifies that Exelon threatened to permanently deny her access to the Braceville facility if she again used FMLA or sick leave. Doc. 52 at 22.

Exelon's only argument for dismissal—besides those under *Egan* and 10 C.F.R. § 26.189(d)—is that a "threat," even a threat to permanently bar an employee from the worksite, does not qualify as an adverse employment action. Doc. 48 at 22; Doc. 58 at 15. That argument fails. True enough, "unfulfilled threats that result in no material harm cannot be considered an adverse employment action." *Dunn v. Washington Cnty. Hosp.*, 429 F.3d 689, 692 (7th Cir. 2005) (internal quotation marks omitted). But Summerland alleges a threat accompanied by material harm. The terms of her employment were materially altered by Exelon formally placing her on a "last chance agreement," under which "if once more [she] requested [FMLA leave] due to [her] disorder," then Exelon would "'deny [her] access permanently'" to the Braceville plant. Doc. 19 at ¶¶ 19-20; *see Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001) ("Retaliatory harassment by … a supervisor can [state an adverse action] if it is severe enough to cause a significant change in the plaintiff's employment status."); *cf. Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 532 (7th Cir. 2003) (holding that the plaintiff failed to state a retaliation claim where "[h]er duties, responsibilities, compensation, and benefits remained the same … and [she] d[id] not allege that [a work] delay affected her opportunities [with her employer] or otherwise injured her career"). Further, as explained in Section II.A.2, *supra*, the threat Summerland faced was specifically targeted at her mental health vulnerabilities, such that it was "one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Silverman*, 637 F.3d at 740 (internal quotation marks omitted); *see also Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th

Cir. 2005) (holding that the plaintiff stated a retaliation claim when her employer "change[d] her hours," reasoning that even though the change "would not be materially adverse for a normal employee," the employer knew the plaintiff "was not a normal employee" but "ha[d] a vulnerability: her son's medical condition," such that "[w]orking [the changed hours] was a materially adverse change for her"). Summerland's ADA retaliation claim therefore may proceed.

### 3.    ADA Interference Claim

The ADA's interference provision makes it unlawful to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed … any right granted or protected by [the ADA]." 42 U.S.C. § 12203(b). To state an ADA interference claim, a plaintiff must allege facts sufficient to show that: "(1) she engaged in activity statutorily protected by the ADA; (2) she was engaged in, or aided or encouraged others in, the exercise or enjoyment of ADA protected rights; (3) the defendant[] coerced, threatened, intimidated, or interfered on account of her protected activity; and (4) the defendant[] were motivated by an intent to discriminate." *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550-51 (7th Cir. 2017).

The complaint alleges that Exelon "committed … acts and omissions … for the purposes of interfering with [Summerland's] request[] [for] reasonable accommodation, coercing [her] to refrain from requesting her reasonable accommodation, and … intimidat[ing] [her] from making her request for a reasonable accommodation." Doc. 19 at ¶ 191. As noted, her opposition brief specifies that Exelon threatened to deny her access to the Braceville facility permanently if she again used FMLA or sick leave. Doc. 52 at 22. Exelon's only argument for dismissal—besides those under *Egan* and 10 C.F.R. § 26.189(d)—is that Summerland does not satisfy the third element because she fails to allege that it engaged in any conduct qualifying as coercion, a threat,

20

intimidation, or interference.  Doc 48 at 22.  That argument is wrong, as threatening to permanently bar her from the Braceville facility plainly satisfies that element.  *See Shaffer v. AMA*, 662 F.3d 439, 443-44 (7th Cir. 2011) ("[The plaintiff] was eligible for FMLA protection, covered by the FMLA, and provided sufficient notice of his intent to take leave.  If [he] can demonstrate that [his employer] fired him to prevent him from exercising his right to reinstatement in his position, he can succeed on an interference theory."); *Arrigo v. Link Stop, Inc.*, 975 F. Supp. 2d 976, 989 (W.D. Wis. 2013) (holding that the plaintiff could proceed with an FMLA interference claim where her employer told her, after she requested maternity leave, "'that [she] had missed enough work and that [she] needed to come back to work immediately,'" reasoning that the employer's "statement … was hostile to the idea of plaintiff taking leave, even if [the leave] was for a reason protected by the FMLA") (alterations in original).  Summerland's ADA interference claim therefore may proceed.

### D. First and Fifth Amendment Claims

Summerland alleges that Defendants violated her Fifth Amendment procedural due process rights by imposing a last chance agreement on her—which threatened termination if she exercised her First Amendment right to speak with and associate with her therapist—without giving her reasonable notice of that agreement's contents, duration, or purpose.  Doc. 19 at ¶¶ 224-225.  Even assuming that Defendants qualify as federal government actors and officials, the claim fails as a matter of law.

"A procedural due process claim requires a two-fold analysis.  First, [the court] must determine whether the plaintiff was deprived of a protected interest; second, [the court] must determine what process is due."  *Leavell v. Ill. Dep't of Nat. Res.*, 600 F.3d 798, 804 (7th Cir. 2010) (internal quotation marks omitted).  Summerland does not have a "protected interest" to "associate with and to speak with her health care therapist."  Doc. 19 at ¶ 225.  As the Seventh

Circuit has explained, "a public employee is protected from adverse employment consequences based on the exercise of the right to freedom of association only when the associational conduct relates to a matter of public concern." *Klug v. Chi. Sch. Bd. of Trs.*, 197 F.3d 853, 857 (7th Cir. 1999). Summerland's speaking and associating with her therapist do not relate to a matter of public concern, and she accordingly has no viable procedural due process claim. *See Barkoo v. Melby*, 901 F.2d 613, 618 (7th Cir. 1990) ("The speaker's motivation and choice of forum are important because, absent those factors, every employment dispute involving a public agency could be considered a matter of public concern."); *see also Colburn v. Trs. of Ind. Univ.*, 973 F.2d 581, 588 (7th Cir. 1992) ("Plaintiffs[,] [in letters of concern to a university's dean,] were not speaking primarily as citizens, but as faculty members concerned about the private matter of the processes by which they were evaluated."); *DeGroot v. Vill. of Matteson*, 2014 WL 5156703, at *3 (N.D. Ill. Oct. 14, 2014) ("[Plaintiff] bases his First Amendment association claim on his attempt to get a job as firefighter with the Village. Although [he] alleges that there was a political dispute between the Pension Board and the Village, his grievance concerns his desire to work as a firefighter. … [Thus] [his] associational conduct concerns his potential employment as a firefighter, and thus is a personal matter of interest only to him."). Summerland's Fifth Amendment procedural due process claim is therefore dismissed.

Summerland also claims that Defendants violated her Fifth Amendment substantive due process rights by threatening her with termination if she exercised her First Amendment right to speak and associate with her therapist, thereby interfering with her "liberty to be a healthy human being." Doc. 19 at ¶¶ 258-259. The substantive due process claim is not viable because, as the Seventh Circuit has held, substantive due process "is limited to violations of fundamental rights, and employment-related rights are not fundamental." *Palka v. Shelton*, 623 F.3d 447, 453 (7th

Cir. 2010) (internal citation omitted). And the First Amendment claim is not viable because Summerland does not have a protected interest in speaking with her therapist, as she does not allege that any interaction with her therapist was a matter of public concern. *See Klug*, 197 F.3d at 857 (holding that "the right to freedom of association" protects "a public employee … from adverse employment consequences … only when the associational conduct relates to a matter of public concern").

###### E.    Section 1985(3) Claim

Summerland alleges that Defendants violated § 1985(3) by undertaking their allegedly unlawful conduct "in concert and by agreement to deprive [her] of [her] rights under the FMLA, ADA, Fifth Amendment[,] and First Amendment." Doc. 19 at ¶ 291. Section 1985(3) creates a civil damages action against "two or more persons" who "conspire… for the purpose of depriving" the plaintiff of "the equal protection of the laws" and who take or cause to be taken "any act in furtherance of the object of such conspiracy." 42 U.S.C. § 1985(3). To state a § 1985(3) claim, a plaintiff must allege "a predicate race-based or class-based equal-protection violation." *Thorncreek Apts. III, LLC v. Mick*, 886 F.3d 626, 633 (7th Cir. 2018). Summerland does not allege any facts suggesting that Defendants committed race-based or class-based equal protection violations. *See D'Amato v. Wis. Gas Co.*, 760 F.2d 1474, 1486-87 (7th Cir. 1985) (holding that discrimination based on disability cannot predicate a § 1985(3) claim). Her § 1985(3) claim is therefore dismissed.

###### Conclusion

Defendants' motion to dismiss is granted in part and denied in part. Summerland's Title VII retaliation, ADA reasonable accommodation, Fifth Amendment, First Amendment, and 42 U.S.C. § 1985(3) claims are dismissed. The dismissals are without prejudice. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015)

("Ordinarily, … a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed."). Summerland has until May 12, 2020 to amend her complaint. If she does not do so, the dismissals of those claims—other than the Title VII retaliation claim—will convert automatically to with prejudice dismissals, and Triangle and Pohlman, which are not named in the surviving claims, will be terminated as party defendants. Exelon—and, if they are named in an amended complaint, Triangle and Pohlman—shall respond to the operative complaint by June 2, 2020.

April 21, 2020

_____
United States District Judge