UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BETTY J. SUMMERLAND, | ) | |
| | ) | |
| Plaintiff, | ) | 19 C 1333 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| EXELON GENERATION COMPANY, BARBARA POHLMAN, and TRIANGLE OCCUPATIONAL MEDICINE, P.A., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**M**EMORANDUM **O**PINION AND **O**RDER

Betty Summerland sued her employer, Exelon Generation Company, and two of its contractors—Triangle Occupational Medicine and Betty Pohlman, Triangle's principal officer and owner—alleging violations of the First and Fifth Amendments, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and 42 U.S.C. § 1985(3). Docs. 1, 19. On Defendants' Civil Rule 12(b)(6) motions, the court dismissed without prejudice the amended complaint's Title VII retaliation, ADA reasonable accommodation, First and Fifth Amendment, and § 1985(3) claims, but granted Summerland leave to replead. Docs. 75-76 (reported at 455 F. Supp. 3d 646 (N.D. Ill. 2020)).

Summerland filed a second amended complaint, which retains three of the four claims that survived dismissal (ADA retaliation and FMLA interference and retaliation against Exelon); omits the fourth surviving claim (ADA interference against Exelon); does not attempt to replead the dismissed claims; adds Pohlman and Triangle as defendants for the FMLA and ADA claims; adds state law intentional infliction of emotional distress ("IIED") and civil conspiracy claims

1

against all Defendants; and adds a declaratory judgment claim against Exelon. Doc. 81. Defendants move to dismiss the new claims under Rule 12(b)(6). Docs. 84, 86. The motions are granted in part and denied in part.

## Background

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Summerland's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Summerland as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

### A.     Parties and Regulatory Background

Exelon operates the LaSalle Generating Station and the Braidwood Generating Station, which are nuclear power production facilities. Doc. 81 at ¶¶ 4, 7. Summerland began work at the LaSalle facility in August 2011 and was reassigned to the Braidwood facility in 2013. *Id.* at ¶ 7. She is currently employed at Braidwood as an Office Service Specialist. *Ibid.* In that role, she processes correspondence, sorts data, and assembles work orders for distribution to the maintenance department. *Id.* at ¶ 8.

Through her company Triangle, Pohlman serves as Exelon's Medical Review Officer ("MRO") pursuant to 10 C.F.R. § 26.183. Doc. 81 at ¶¶ 5-6, 26. Federal law requires the

operator of a nuclear reactor to maintain a "fitness-for-duty" ("FFD") program to ensure that employees are not "mentally or physically impaired from any cause, which in any way adversely affects their ability to safely and competently perform their duties." 10 C.F.R. §§ 26.3(a), 26.23(b). The MRO is responsible for reviewing drug testing results as well as advising and assisting the FFD program generally. *Id*. § 26.183(c).

In her role as MRO, Pohlman may advise, instruct, or demand that Exelon "pull an Exelon employee badge." Doc. 81 at ¶ 23. "Pulling a badge" is a colloquial reference to a regulation, 10 C.F.R. § 73.56, that requires a nuclear power operator to maintain an "access authorization program" regulating unescorted access to a nuclear facility. Doc. 81 at ¶ 26. The FFD and access authorization programs are components of the "insider mitigation" program, which monitors the trustworthiness and reliability of facility employees. 10 C.F.R. § 73.55(b)(9). For a nuclear facility employee, having her "badge pulled" is tantamount to termination because it denies entry to the workplace. Doc. 81 at ¶ 26.

      **B.**      **Summerland's Use of FMLA Leave and the Last Chance Agreement**

Summerland suffers from several mental health conditions, including adjustment, anxiety, and depression disorders. *Id*. at ¶ 13. Those conditions sometimes prevent her from working, driving, or otherwise leaving her home, and they occasionally manifest in panic attacks that render her dysfunctional. *Ibid*. Exelon placed Summerland on medical leave in June 2017, whereupon she began treatment with a professionally licensed health care provider. *Id*. at ¶¶ 14, 16-17. Summerland does not allege that she invoked her FMLA rights for that period of medical leave.

Summerland returned to work in August 2017. *Id*. at ¶ 16. She responsibly manages her treatment and, as a result, has maintained a discipline-free work record. *Id*. at ¶ 15. Her work

3

performance evaluations are positive, marred only by non-substantive criticism from supervisors who are hostile to her exercising her FMLA and ADA rights. *Ibid*.

For five years, Summerland's shift was from 6:00 a.m. to 2:30 p.m., which allowed her to attend the last time slot (4:00 p.m.) offered by her therapist. *Id*. at ¶¶ 18-19. On November 16, 2017, Exelon changed her shift to 7:00 a.m. to 3:30 p.m., which made it impossible for her to attend therapy with her therapist. *Id*. at ¶ 19. Summerland tried to negotiate with Exelon for a start time that would allow her to attend therapy as a reasonable accommodation, but Exelon refused. *Id*. at ¶ 20. Exelon's refusal triggered in Summerland a panic attack. *Ibid*.

Also on November 16, 2017, Summerland submitted a request for FMLA medical leave. *Id*. at ¶ 21. Exelon approved the request four days later. *Id*. at ¶ 22. On November 30, Summerland "called-in" an FMLA leave request. *Id*. at ¶ 23. When she did so, the Braidwood facility's site nurse told her that her "badge was being pulled" and that she would be referred to Exelon's Employee Assistance Program. *Ibid*.

On December 19 and 20, 2017, while Summerland was on FMLA leave, Pohlman and the Braidwood site nurse informed her that she had been placed on "a last chance agreement." *Id*. at ¶ 24. Specifically, Pohlman and the site nurse told Summerland that if she again requested FMLA or sick leave due to mental health issues, Exelon, Pohlman, and Triangle would permanently revoke her facility access. *Ibid*. Pohlman remarked that Summerland was untrustworthy and unreliable, and warned that she "did not work at Walmart." *Ibid*. Exelon, Pohlman, and Triangle did not comply with Summerland's several requests for a copy of the supposed last chance agreement. *Id*. at ¶ 28. No law or regulation provides for such an agreement; rather, Pohlman invented it to punish Summerland for having requested an ADA accommodation and FMLA leave. *Ibid*. Since the last chance agreement threat, Summerland

4

has attempted to obtain therapy without requesting FMLA leave, which has aggravated her mental health conditions. *Id*. at ¶ 27.

### C. Subsequent Events

Summerland could not work at the Braidwood facility from November 30, 2017, when her badge was pulled, until January 2, 2018, when her badge was returned after her therapist determined she was "fit for duty." *Id*. at ¶ 23. On May 15, 2018, some four months after she returned to work, Exelon threatened Summerland with revocation of her work site access because she failed to attend a scheduled therapy session. *Id*. at ¶ 26. Summerland had rescheduled the session due to a conflicting medical appointment for her leg. *Ibid*. In an email exchange that day, Pohlman told the Braidwood site nurse that the missed therapy session was "completely UNACCEPTABLE" and did not display "Trustworthy and Reliable behavior." Doc. 81-2 at 1. Pohlman continued: "If [Summerland] 'forgets' just one more time, I will make it simple for her....NO ACCESS until all treatment complete." *Ibid*.

On November 5, 2018, Summerland filed a charge against Exelon with the Equal Employment Opportunity Commission ("EEOC"), claiming that she was "discriminated against because of [her] disability, and in retaliation for engaging in protected activity, in violation of the [ADA]." Doc. 81-3 at 2. The EEOC issued a right-to-sue letter three weeks later, *id*. at 1, after which Summerland timely filed this suit, Doc. 1.

## Discussion

### I. FMLA Claims Against Pohlman and Triangle

The FMLA prohibits "any employer" from interfering with an employee's exercise of FMLA rights or retaliating against an employee for opposing practices that the FMLA forbids. *See* 29 U.S.C. § 2615(a)(1), (2). The court has ruled that Summerland may proceed with FMLA interference and retaliation claims against Exelon. 455 F. Supp. 3d at 658-60. The operative

5

complaint adds Pohlman and Triangle as defendants for those claims. Doc. 81 at ¶¶ 144-221, 261-329. Pohlman and Triangle seek dismissal, arguing that neither was Summerland's "employer" within the meaning of the FMLA. Doc. 85 at 4-5.

The FMLA defines "employer" to include "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(I). The Seventh Circuit has held that "the FMLA's definition of 'employer' is broader than that of Title VII and encompasses some individual liability." *Eppinger v. Caterpillar Inc.*, 682 F. App'x 479, 481 (7th Cir. 2017). That definition thus extends beyond the employer itself to at least some of the employer's individual agents.

"The Seventh Circuit has not supplied a test for assessing individual liability under the FMLA," but "[t]he [Fair Labor Standards Act's] definition of 'employer' is 'materially identical' to the FMLA's definition." *Katz v. Nw. Orthopaedics & Sports Med. Ltd.*, 2020 WL 1986965, at *9 (N.D. Ill. Apr. 27, 2020) (quoting *Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 414 (3d Cir. 2012)); *see* 29 U.S.C. § 203(d) (defining "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee"). Under the FLSA, an individual qualifies as an "employer" if she "had supervisory authority over the complaining employee and was responsible in whole or part for the alleged violation." *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987); *see also Luder v. Endicott*, 253 F.3d 1020, 1022 (7th Cir. 2001) ("[T]he supervisor who uses his authority over the employees whom he supervises to violate their rights under the FLSA is liable for the violation."). Given their materially identical definitions of "employer," the FLSA test governs the scope of individual liability under the FMLA as well. *See Katz*, 2020 WL 1986965, at *9; *Ruckebeil v. Cancer*

6

*Treatment Centers of Am., Inc.*, 2016 WL 878585, at *2 (N.D. Ill. Mar. 8, 2016); *Freemon v. Foley*, 911 F. Supp. 326, 330-31 (N.D. Ill. 1995).

The complaint alleges that Pohlman, as Exelon's MRO, may demand that Exelon pull an employee's badge, and further alleges that pulling an employee's badge is tantamount to termination. Doc. 81 at ¶¶ 23, 26. The power to terminate is quintessential supervisory authority. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 905 (7th Cir. 2018) (holding under Title VII that "the ability to hire and fire ranks as most significant" in determining whether the defendant is the plaintiff's employer). It follows, at least on the pleadings, that Pohlman and Triangle exercised "supervisory authority" over Summerland, and therefore that they qualify as employers under the FMLA. *Riordan*, 831 F.2d at 694.

Pohlman and Triangle argue that their status as outside contractors and the possibility that Exelon could reject their recommendations to pull an employee's badge mean that they lacked supervisory authority over Summerland. Doc. 85 at 4-5. But Pohlman herself, in an email to Exelon's site nurse, seemed to believe that her views were decisive. Doc. 81-2 at 1 ("I will make it simple for [Summerland]....NO ACCESS until all treatment complete."). And, more generally, "[i]t is not uncommon for employers to hire subcontractors or otherwise outsource supervision." *Johnson*, 892 F.3d at 904-05. It is therefore plausible that Pohlman and Triangle are employers under the FMLA. The FMLA claims against them survive dismissal.

II.     **ADA Claims Against Pohlman and Triangle**

The ADA prohibits retaliation against an individual for opposing disability discrimination. *See* 42 U.S.C. § 12203(a). The court has ruled that Summerland could proceed with an ADA retaliation claim against Exelon. 455 F. Supp. 3d at 662-63. The second amended complaint adds Pohlman and Triangle as defendants for that claim. Doc. 81 at ¶¶ 222-260, 330-

7

368. Pohlman and Triangle seek dismissal on the ground that they were not named as respondents in Summerland's EEOC charge. Doc. 85 at 5-6; *see* Doc. 81-3 at 2.

Before a plaintiff files suit under the ADA, she must file an administrative charge with the EEOC. *See* 42 U.S.C. § 12117(a) (adopting Title VII enforcement procedures for ADA claims); *id*. § 2000e-5(f)(1) (requiring administrative exhaustion before suit is filed); *Riley v. City of Kokomo*, 909 F.3d 182, 189 (7th Cir. 2018) ("An ADA plaintiff must file a charge with the EEOC before bringing a court action against an employer."). This exhaustion rule "serves the dual purpose of affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion, and of giving the employe[r] some warning of the conduct about which the employee is aggrieved." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (internal citations omitted). Given these purposes, "a party not named as the respondent in the charge may not ordinarily be sued in a private civil action." *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir. 2013).

In *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890 (7th Cir. 1981), the Seventh Circuit carved "an exception" to this general rule "where the 'unnamed party has been provided with adequate notice of the charge, under circumstances where the party has been given the opportunity to participate in conciliation proceedings aimed at voluntary compliance.'" *Alam*, 709 F.3d at 666 (quoting *Eggleston*, 657 F.3d at 905). The exception does not apply here because Summerland does not allege that Pohlman or Triangle received notice of her charge or had the opportunity to participate in conciliation. *See ibid*. (affirming dismissal for failure to exhaust where the plaintiff "failed to allege *any* facts in the amended complaint regarding whether [the defendant] had notice of an EEOC charge or an opportunity to participate in conciliation proceedings"); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1089 (7th Cir. 2008)

(affirming dismissal where the complaint failed to allege that the defendant had notice of the charge). In any event, Summerland forfeited any argument under the *Eggleston* exception because she does not rely on it in opposing dismissal. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court. That is true whether it is an affirmative argument in support of a motion to dismiss or an argument establishing that dismissal is inappropriate.") (citations omitted).

Summerland does cite to Sixth Circuit caselaw adverting to an exception to the exhaustion rule for "alter egos" of the respondent named in an EEOC charge. Doc. 100 at 17 (citing *Knafel v. Pepsi-Cola Bottlers, Inc.*, 899 F.2d 1473 (6th Cir. 1990)). But Summerland does not explain how Pohlman and Triangle qualify as alter egos of Exelon under the Sixth Circuit's test, which demands a "clear identity of interest" between the named and unnamed parties, *Knafel*, 899 F.2d at 1481, thereby forfeiting the point. In any event, *Knafel* and related out-of-circuit precedents are not controlling authority in this circuit.

The dismissal of the ADA retaliation claims against Pohlman and Triangle is without prejudice. The Seventh Circuit has explained that "the proper remedy for a failure to exhaust administrative remedies is to dismiss the suit without prejudice, thereby leaving the plaintiff free to refile [her] suit when and if [she] exhausts all of [her] administrative remedies or drops the unexhausted claims." *Greene v. Meese*, 875 F.2d 639, 643 (7th Cir. 1989); *see also Ford v. Johnson*, 362 F.3d 395, 401 (7th Cir. 2004). This principle applies to dismissals for failure to exhaust a claim in an EEOC charge; such dismissals are without prejudice to the plaintiff pursuing her claim in federal court upon properly exhausting the unexhausted claims, subject of course to the statute of limitations and any other defenses. *See Teal v. Potter*, 559 F.3d 687, 693

(7th Cir. 2009) ("Because [the plaintiff] failed to exhaust administrative remedies, her complaint must be dismissed without prejudice."). That said, "[t]he determination that [Summerland] ha[s] failed to exhaust [her] administrative remedies" for her ADA claims against Pohlman and Triangle is "preclusive with respect to an attempt by [her] to relitigate the question whether [she] ha[s] exhausted [her] administrative remedies before filing [this] … suit." *Hill v. Potter*, 352 F.3d 1142, 1147 (7th Cir. 2003).

### III.  Intentional Infliction of Emotional Distress Claims

The operative complaint asserts IIED claims against all Defendants. Doc. 81 at ¶¶ 487-601. To state an IIED claim under Illinois law, a plaintiff must allege facts sufficient to infer: (1) "conduct [that is] truly extreme and outrageous"; (2) that the defendant "intend[ed] that his conduct inflict severe emotional distress, or know that there [was] at least a high probability that his conduct [would] cause severe emotional distress"; and (3) that "the conduct … in fact cause[d] severe emotional distress." *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988) (emphases omitted); *see also Lopez v. City of Chicago*, 464 F.3d 711, 720 (7th Cir. 2006) (same).

Defendants argue that the complaint does not allege extreme and outrageous conduct. Doc. 85 at 9-11; Doc. 87 at 5-8. As a general rule, to qualify as extreme and outrageous, "the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 83 (Ill. 2003); *see also Lewis v. Sch. Dist. No. 70*, 523 F.3d 730, 747 (7th Cir. 2008) (same). Illinois law, however, recognizes that "[b]ehavior which (though rude, abrasive or extremely inconsiderate) may not otherwise be actionable may be deemed outrageous if the defendant knows that the plaintiff is peculiarly susceptible to emotional distress." *McGrath*, 533 N.E.2d at 811; *see also Dixon v. Cnty. of Cook*, 819 F.3d 343, 351 (7th Cir. 2016) (same). A defendant is not automatically liable for any rude, abrasive, or inconsiderate behavior toward a susceptible

10

plaintiff, but a plaintiff's susceptibility to such behavior is one factor to consider in determining whether it is extreme and outrageous. *See Cairel v. Alderden*, 821 F.3d 823, 835-36 (7th Cir. 2016) (holding that "whether the defendant knew the plaintiff was particularly susceptible to emotional distress" is one "factor[] to decide whether conduct is objectively extreme and outrageous"); *Honaker v. Smith*, 256 F.3d 477, 492 (7th Cir. 2001) ("An additional consideration in determining whether extreme and outrageous behavior exists is whether the plaintiff is particularly susceptible to emotional distress … ."); *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (Ill. 1992) ("Another factor to be considered is the defendant's awareness that the plaintiff is particularly susceptible to emotional distress, because of some physical or mental condition or peculiarity.").

It is plausible that Defendants, given their knowledge of Summerland's mental health conditions, in turn knew that she was particularly susceptible to emotional distress. Doc. 81 at ¶¶ 13, 16, 24. Defendants thus could potentially be found liable even if they behaved in a merely "rude, abrasive or inconsiderate" manner toward her. *Dixon*, 819 F.3d at 351; *see also Kolegas*, 607 N.E.2d at 211; *McGrath*, 533 N.E.2d at 811. Summerland contends that the following allegations from her complaint meet that standard: (1) Pohlman told Summerland she "did not work at Walmart," Doc. 81 at ¶ 24; (2) Defendants lied about the non-existent last chance agreement and, if it existed, refused to give her a copy, *id*. at ¶ 28; (3) Defendants threatened to deny her facility access, which would have amounted to termination, *id*. at ¶ 26; and (4) Exelon changed her work schedule to make it impossible for her to attend therapy with her therapist, which triggered a panic attack, *id*. at ¶¶ 19-20, 32. Doc. 97 at 6-7; Doc. 100 at 23-24.

For a plaintiff particularly susceptible to emotional distress, these allegations suffice to state an IIED claim. The "Walmart" insult, deceit and concealment concerning the last chance

11

agreement, and making it impossible for Summerland to see her therapist could plausibly be deemed outrageous when directed against a plaintiff with known emotional disorders. In so holding, the court recognizes the "general hesitation to find [IIED] in the workplace." *Richards v. U.S. Steel*, 869 F.3d 557, 567 (7th Cir. 2017). Nevertheless, on a motion to dismiss, the court cannot conclude as a matter of law that Summerland suffered merely "everyday job stresses" insufficient to make out an IIED claim. *Ibid.*; *see also Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010) (holding that "a particularly ugly insult" could sustain an IIED verdict for the plaintiff where the defendant knew the plaintiff "was particularly susceptible to emotional distress"); *Kolegas*, 607 N.E.2d at 212-13 (reversing dismissal of a reckless infliction of emotional distress claim where "the defendants knew that the plaintiffs would be peculiarly susceptible to emotional distress").

Finally, in a footnote, Pohlman and Triangle argue that the IIED claims are preempted by the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq*. Doc. 85 at 11 n.4. The IHRA includes this preemption provision: "Except as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 ILCS 5/8-111(D). A claim is independent of the IHRA, and hence not preempted, "if the conduct would be actionable even aside from its character as a civil rights violation because the IHRA did not 'furnish[] the legal duty that the defendant was alleged to have breached.'" *Krocka v. City of Chicago*, 203 F.3d 507, 516-17 (7th Cir. 2000) (quoting *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 23 (Ill. 1997)).

Pohlman and Triangle contend that Summerland's IIED claims are preempted because they are "based upon the same allegations pled in support of [her] ADA claims." Doc. 85 at 11 n.4. That argument incorrectly focuses on the factual allegations underlying the claims, rather

12

than the legal duties on which the claims are premised. *See Naeem v. McKesson Drug Co.*, 444 F.3d 593, 604 (7th Cir. 2006) ("[T]he proper inquiry [is] not whether the facts that support [an IIED] claim could also have supported a discrimination claim, but instead whether [the plaintiff] can prove the elements of [IIED] independent of legal duties furnished by the IHRA."). Under the correct standard, the question is whether Summerland alleges "behavior that would be a tort no matter what [Pohlman's and Triangle's] motives," *id*. at 605—that is, whether taking the alleged tortious actions "for *any* reason [would] support a claim for [IIED]," *Sanglap v. LaSalle Bank, FSB*, 345 F.3d 515, 520 (7th Cir. 2003). Here, whatever their subjective motives, Defendants' insults, deception concerning the last chance agreement, and interference with Summerland's therapy appointments could be deemed objectively outrageous, at least on the pleadings. The IIED claims therefore are not preempted by the IHRA.

## IV. Civil Conspiracy Claims

The operative complaint alleges that Defendants committed state law civil conspiracies to violate her FMLA and ADA rights and to intentionally inflict emotional distress on her. Doc. 81 at ¶¶ 369-486, 602-640. Under Illinois law, "[c]ivil conspiracy is defined as a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means." *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999) (quotation marks omitted); *see also Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 938-39 (7th Cir. 2012) (same); *Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. 2004) (same). To state a civil conspiracy claim, "a plaintiff must allege an agreement and a tortious act committed in furtherance of that agreement." *McClure*, 720 N.E.2d at 258; *see also Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007) (same). "[A] conspiracy is not an independent tort. Where … a plaintiff fails to state an independent cause of action underlying its conspiracy allegations, the claim for a conspiracy also

13

fails." *Horist v. Sudler & Co.*, 941 F.3d 274, 281 (7th Cir. 2019) (quoting *Indeck N. Am. Power Fund, L.P. v. Norweb PLC*, 735 N.E.2d 649, 662 (Ill. App. 2000)).

Defendants first argue that the complaint fails to allege an agreement among Exelon, Pohlman, and Triangle. Doc. 85 at 7-8, 11; Doc. 87 at 9. That argument fails, as the complaint contains enough factual material to plausibly infer an agreement among Defendants to accomplish the acts giving rise to the FMLA, ADA, and IIED claims. The "last chance agreement" was jointly delivered to Summerland by Exelon's site nurse and Pohlman, and all Defendants threatened to deny Summerland access to the facility. Doc. 81 at ¶ 24. The May 15, 2018 email exchange between the Braidwood site nurse and Pohlman show that they coordinated their communications with Summerland. *Id.* at ¶ 26; Doc. 81-2. And Summerland ties these facts together by alleging that Defendants committed the wrongful acts "in concert" and "by agreement." Doc. 81 at ¶ 34. These allegations suffice to allege an agreement at the pleading stage. *See Virnich v. Vorwald*, 664 F.3d 206, 213 (7th Cir. 2011) (holding that the agreement element of a civil conspiracy claim was properly pleaded where the defendants were alleged to have "agreed, and then acted in cooperation").

Defendants next argue that Summerland's civil conspiracy claims fail because no defendant committed any wrongful or tortious act. Doc. 85 at 7-8, 11; Doc. 87 at 9-12. Defendants are incorrect as to the IIED conspiracy claim, as both Exelon and Pohlman (and therefore Triangle) allegedly behaved outrageously toward Summerland. Doc. 81 at ¶¶ 20, 24.

It is unclear whether Illinois law recognizes a civil conspiracy to violate the FMLA and the ADA. As noted, a civil conspiracy claim must be founded upon a "tortious act." *McClure*, 720 N.E.2d at 258; *see also Scott v. Aldi, Inc.*, 703 N.E.2d 526, 529 (Ill. 1998) ("The gist of a civil conspiracy claim is not the agreement itself, but the tortious acts performed in furtherance

of the agreement."); *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994) ("A cause of action for civil conspiracy exists only if one of the parties to the agreement commits some act in furtherance of the agreement, which is itself a tort."). Summerland does not identify any case finding an Illinois civil conspiracy to violate federal employment law. Doc. 97 at 8; Doc. 100 at 18-19. And some cases could be read to implicitly suggest that Illinois law would not recognize such violations as "torts" for purposes of a civil conspiracy claim. *See Scott*, 703 N.E.2d at 529 (holding that the "violation of a statute or ordinance" can be tortious if the statute is "designed to protect human life or property"); *Atanus v. S&C Elec. Co.*, 454 F. Supp. 2d 753, 756 (N.D. Ill. 2006) ("A violation of a federal regulation is not a tort. Accordingly, a violation of the regulation involved in this case is not an unlawful act that could form the basis of [the plaintiff's] conspiracy claims.") (citing *Scott*, 703 N.E.2d at 529).

That said, the Seventh Circuit has observed that federal employment discrimination laws create "statutory torts." In *Papa v. Katy Industries, Inc.*, 166 F.3d 937 (7th Cir. 1999), the court held that a parent company is liable for the Title VII violations of its subsidiaries when "the traditional conditions [are] present for 'piercing the veil.'" *Id*. at 940. The Seventh Circuit reasoned that "[i]f … a parent (or other affiliate) would be liable for the torts or breaches of contract of its subsidiary, it ought equally to be liable for the statutory torts created by federal antidiscrimination law." *Id*. at 941; *see also Prince v. Appleton Auto, LLC*, 978 F.3d 530, 534 (7th Cir. 2020) (same). In *Schobert v. Illinois Department of Transportation*, 304 F.3d 725 (7th Cir. 2002), the court held that a Title VII plaintiff must demonstrate harm because "[e]very tort, whether it be one derived from common law or a statutory tort like Title VII, requires a showing of harm." *Id*. at 731. These decisions interpreted Title VII, not Illinois common law, but they

15

suggest that violations of federal employment discrimination law can be considered tortious in some contexts.

It is unnecessary to decide now whether an Illinois law civil conspiracy claim can rest on a conspiracy to violate federal employment discrimination law. The underlying FMLA claims are proceeding as to all Defendants, and the ADA claim is proceeding as to Exelon. Discovery on the alleged state law civil conspiracies will cover the same ground as discovery on the underlying federal claims, so the prudent course is to permit the FMLA and ADA civil conspiracy claims to proceed, with the understanding that Defendants may renew their argument at summary judgment. *See Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 802-03 (7th Cir. 2008) (explaining that pleading standards are meant to prevent "costly discovery" where the plaintiff lacks "a substantial case"); *Panoramic Stock Images, Ltd. v. John Wiley & Sons, Inc.*, 963 F. Supp. 2d 842, 852 (N.D. Ill. 2013) ("Because this case remains at the pleading stage, [and] because allowing [the claims to proceed] will not appreciably (if at all) increase the discovery burden … the more prudent course is to allow those claims to proceed, at least for now.").

Finally, Summerland claims in her opposition briefs that Defendants conspired to commit either fraudulent or negligent misrepresentation. Doc. 97 at 9-11; Doc. 100 at 20. A complaint need not plead legal theories, so the court will consider this potential claim even though the operative complaint does not explicitly name it. *See Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011) ("A complaint need not identify legal theories, and specifying an incorrect theory is not a fatal error."); *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992) (same). Summerland points to only one alleged misrepresentation: Exelon's statement in its first motion to dismiss, Doc. 15 at 6-7, that it had no authority to disregard

16

Pohlman's medical determinations. Doc. 97 at 9-10; Doc. 100 at 20; Doc. 81 at ¶ 29. Summerland believes that statement to be false, arguing that under the relevant regulations Exelon had leeway to reexamine Pohlman's determinations. Doc. 81 at ¶¶ 30-31.

No plausible claim for either fraudulent or negligent misrepresentation can arise from Exelon's statement. An element of both claims is "action by the plaintiff in justifiable reliance on the truth of the statement." *Doe v. Dilling*, 888 N.E.2d 24, 35 (Ill. 2008) (setting forth the elements of fraudulent misrepresentation); *Bd. of Educ. of Chicago v. A, C & S, Inc.*, 546 N.E.2d 580, 591 (Ill. 1989) ("Negligent misrepresentation has essentially the same elements, except that … [t]he defendant need not know that the statement is false."). Summerland does not allege that she believed Exelon's statement, let alone that she acted in reliance on its truth. Because Summerland fails to state a claim that Exelon committed either fraudulent or negligent misrepresentation, any claim that Defendants conspired to that end also fails because "conspiracy is not an independent tort." *Horist*, 941 F.3d at 281.

## V.     Declaratory Judgment Claim Against Exelon

Finally, Summerland seeks a declaration under 28 U.S.C. § 2201 that Exelon violated the FMLA and that she may recover fees and costs incurred in litigating her earlier motion for a temporary restraining order. Doc. 81 at ¶¶ 641-682. "[T]he federal courts have discretion to decline to hear a declaratory judgment action, even though it is within their jurisdiction." *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 747 (7th Cir. 1987). In determining whether to grant declaratory relief, a court may take into account "considerations of practicality and wise judicial administration." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995). If "the substantive suit would resolve the issues raised by the declaratory judgment action," then "the declaratory judgment action serves no useful purpose because the controversy has ripened and the uncertainty and anticipation of litigation are alleviated." *Intercon Sols., Inc.*

17

*v. Basel Action Network*, 969 F. Supp. 2d 1026, 1065 (N.D. Ill. 2013) (quoting *Amari v. Radio Spirits, Inc.*, 219 F. Supp. 2d 942, 944 (N.D. Ill. 2002)), *aff'd*, 791 F.3d 729 (7th Cir. 2015).

The declaratory judgment sought by Summerland would serve no useful purpose. The court has already denied as premature her request for fees in connection with the TRO motion, reasoning that any fee disputes can be resolved after judgment is entered. Doc. 68; *see* 29 U.S.C. § 2617(a)(3) (providing for fees and costs "in addition to any judgment awarded to the plaintiff" under the FMLA). Summerland presents no reason to disturb that ruling. She does argue that a declaratory judgment is needed to establish her entitlement to fees under a Department of Labor regulation and to prevent any contest among Defendants regarding fees. Doc. 97 at 11-12. But those matters can be addressed at the conclusion of litigation without a declaratory judgment. The declaratory judgment claim accordingly is dismissed.

## Conclusion

Defendants' motions to dismiss are granted in part and denied in part. Summerland's ADA retaliation claims against Pohlman and Triangle, civil conspiracy claim premised on misrepresentation, and declaratory judgment claim against Exelon are dismissed. The dismissal is without prejudice as to the ADA retaliation claims against Pohlman and Triangle, *see Greene*, 875 F.2d at 643, though Summerland will not be permitted to replead those claims in this case unless and until she exhausts them, *see Hill*, 352 F.3d at 1147. The dismissal is with prejudice as to the civil conspiracy claim premised on misrepresentation, as well as to the declaratory judgment claim. Summerland has already filed three complaints in this case, *see Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818-19 (7th Cir. 2013) ("The Bank insists that the district judge abused his discretion by dismissing the complaint with prejudice rather than allowing it to try again. But in court, as in baseball, three strikes and you're out."); *Agnew v. NCAA*, 683 F.3d

328, 347 (7th Cir. 2012) (affirming dismissal with prejudice after the "plaintiffs had three opportunities to identify a relevant market in which the NCAA allegedly committed violations of the Sherman Act"), and in any event the court can discern no amendment that would cure the flaws in those claims, *see Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 335 (7th Cir. 2018) ("Nothing in Rule 15, nor in any of our cases, suggests that a district court must give leave to amend a complaint where a party does not request it or suggest to the court the ways in which it might cure the defects. To the contrary, we have held that courts are within their discretion to dismiss with prejudice where a party does not make such a request or showing."); *Gonzalez-Koeneke v. West*, 791 F.3d 801, 808 (7th Cir. 2015) ("A district court acts within its discretion in … dismissing a complaint with prejudice … when the plaintiff fails to demonstrate how [an] amendment would cure the deficiencies in the prior complaint."). Exelon has already answered the operative complaint, Doc. 88, and Pohlman and Triangle shall answer the surviving portions of the operative complaint by January 19, 2021.

December 30, 2020  
　　　　　　　　　　　　　　　　　　　　　_____  
　　　　　　　　　　　　　　　　　　　　　　　United States District Judge

19